# United States District Court

### For the

## Western District of New York



ZAKKIYYA CARTER, as Pro Se            )
                                     )            42 U.S.C. 1983
        Plaintiff                    )            Docket No. 24-CV-552
                                     )
                                     )
        -V-                          )
                                     )
CITY OF BUFFALO,
JANE AND JOHN DOES, MIA SULLIVAN,
JENNIFER HUBACHER, ASHLEY WACZKOWSKI
DAWN FREEMAN, SUICIDE PREVENTION AND CRISIS SERVICES INC
LAURA HANRAHAN, MD, MARK SUTTON, MD,
MARKEITH PRIDGOEN, JULIA RINGLE, MD,
LAURA FLEMING, JANE AND JOHN DOES,
ERIE COUNTY MEDICAL CENTER
ERIE COUNTY MEDICAL  CENTER COPORATION
NICOLE ABRUZZINO, PAULA FEROLETO, JANE
AND JOHN DOES, ALICIA FLOOD and SHALONNA WATTS

### ALL IN THEIR OFFICIAL AND UNOFFICIAL CAPACITIES

### PLAINTIFF'S PARTY INFORMATION

1.      Plaintiff ZAKKIYYA CARTER resides at 280 Stevens  Avenue, Buffalo, New York 14215,

located in Erie County and the State of New York.

### DEFENDANTS PARTIES INFORMATION

2.      Upon information and belief, the City of Buffalo is a municipal corporation duly

organized and existing under and pursuant to the laws of the State of New York.

3.      City of Buffalo E-District Police Officer JOHN DOE is employed by the City of Buffalo and was acting in such capacity during the events which give rise to this lawsuit.

4.      City of Buffalo E-District Police Officer JOHN DOE is employed by the City of Buffalo and was acting in such capacity during the events which give rise to this lawsuit.

5.      City of Buffalo E-District Police Officer JOHN DOE is employed by the City of Buffalo and was acting in such capacity during the events which give rise to this lawsuit.

6.      Upon information and belief, SUICIDE INTERVENTION AND CRISIS SERVICES INC, mentioned herein after as "CRISIS SERVICES" is a nonprofit organization were created and existed as a form of intervention and support for individuals experiencing mental health crisis or other emergencies, duly organized to the County of Erie and existing under and pursuant to the laws of the State of New York.

7.      Crisis Services MIA SULLIVAN is a licensed social worker, agent, servant, representatives, and or employee, at all times here relevant employed by Suicide Intervention and Crisis Services Inc, mentioned herein after as "CRISIS SERVICES" and was acting in such capacity during the events which give rise to this lawsuit.

8.      Crisis Services JENNIFER HUBACHER  is a licensed social worker, agent, servant, representatives, and or employee, at all times here relevant employed by Suicide Intervention and Crisis Services Inc, mentioned herein after as "CRISIS SERVICES" and was acting in such capacity during the events which give rise to this lawsuit.

9.      Crisis Services ASHLEY WACZKOWSKI  is a licensed social worker, agent, servant, representatives, and or employee, at all times here relevant employed by Suicide Intervention

and Crisis Services Inc, mentioned herein after as "CRISIS SERVICES" and was acting in such capacity during the events which give rise to this lawsuit.

10.     Crisis Services DAWN FREEMAN is a licensed social worker, agent, servant, representatives, and or employee, at all times here relevant employed by Suicide Intervention and Crisis Services Inc, mentioned herein after as "CRISIS SERVICES" and was acting in such capacity during the events which give rise to this lawsuit.

11.     Upon information and belief, ALICIA FLOOD is a private citizen, actor in concert, and or accomplice to JOHN DOE'S, CRISIS SERVICES and NICOLE ABRUZZINO and was acting in such capacity during the events which give rise to this lawsuit.

12.     Upon information and belief, SHALONNA WATTS is a private citizen, actor in concert, and or accomplice to JOHN DOE'S and CRISIS SERVICES and was acting in such capacity during the events which give rise to this lawsuit.

13.     Upon information and belief, ERIE COUNTY MEDICAL CENTER and/or ERIE COUNTY MEDICAL CENTER  CORPORATION, mentioned herein after as ECMCC is a municipal corporation duly organized and existing under and pursuant to the laws of the State of New York.

14.     ECMCC LAURA HANRAHAN is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to this lawsuit.

15.     ECMCC MARK SUTTON is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to this lawsuit.

16.     ECMCC MARKEITH PRIDGOEN is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to this lawsuit.

17.     ECMCC LAURA FLEMING is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to this lawsuit.

18.     ECMCC JOHN AND JANE DOE'S is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to this lawsuit.

19.     ECMCC JULIA RINGLE is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to this lawsuit.

20.     Supreme Court justice PAULA L, FEROLETO is a Supreme Court Justice who has taken an oath to uphold the constitution and protect the rights of citizens and was acting in such capacity during the events which give rise to this lawsuit.

21.     Upon information and belief ECMCC, Erie County Child and Family Services and or County of Erie is a municipality, in which NICOLE ABRUZZINO was employed by and was acting such capacity during the events which give rise to this lawsuit.

## COMPLAINT AND DEMAND FOR JURY TRIAL

22.     Plaintiff, ZAKKIYYA CARTER, brings this action against Defendants/ CITY OF BUFFALO et al., and alleges, upon information and belief, the record of previous proceedings, firsthand knowledge and hereby submits the following for consideration by this honorable Court.

## APPLICATION OF LIBERAL CONSTRUCTION

23.     Plaintiff ZAKKIYYA CARTER appears here in her pro se status. As such, this Plaintiff respectfully requests that her pleadings herein will be liberally construed by this honorable Court, pursuant to the standards established by the Supreme Court of the United States in Haines v. Kerner, 404 U.S. 519 (1972) (Holding that: " a pro se litigant's pleadings, "however in artfully pleaded," are held to the most liberal of standards because pro se litigants may be less capable of formulating legally-competent initial pleadings.)

## JURISDICTIONAL STATEMENT

24.     In accordance with 42 U.S. Code § 1983, this court has jurisdiction over claims alleging violations of constitutional rights, including retaliation against the Plaintiff for exercising First Amendment rights and participating in protected activities.

25.     Additionally, the Plaintiff invokes 42 U.S. Code § 1985, which address conspiracies to interfere with civil rights, and U.S. Code § 2000e-3(a), which prohibits retaliation under Title VII of the Civil Rights Act of 1964.

26.     Jurisdiction and venue is proper here pursuant to 28 U.S. Code § 1391 which provides in relevant part that "28 USC §1391. Except as otherwise provided by law—(1) this section shall govern the venue of all civil actions brought in district courts of the United States; and (2) the proper venue for a civil action shall be determined without regard to whether the action is local or transitory in nature." (See, e.g., Monroe v. Pape, 365 U.S. 167 (1961) (holding that officials acting in abuse of their authority who deprive an individual of a constitutional right may be liable under § 1983.)(See also, Brown v. State of New York, 89 N.Y.2d 172, 674 N.E.2d 1129, 52 N.Y.S.2d 223 (1996). 2 N.Y. CONST. art. I, § 11.) In Brown, the New York Court of Appeals held that individuals may assert claims for compensatory damages for violations of their rights protected by the equal protection guarantees of the New York State Constitution.

27.     Venue is properly laid in the Western District of New York Pursuant to 28 U.S.C. §

1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated.

28.    Article III of the U.S. Constitution provides Federal Courts can hear all cases in law and equity arising under this Constitution, [and] the laws of the United States. The Supreme Court has interpreted this clause broadly, finding that it allows federal courts to hear any case in which there is a federal ingredient, see Osborn v. Bank of the United States, 22 U.S. 738 (1824)

29.    Plaintiff asserts that this court is appropriate as this complaint falls within this district's subject matter jurisdiction and seek damages from Defendants for injuries suffered from an alleged fraud involving state actors, mental anguish, intentional infliction of emotional distress, false imprisonment, harm to reputation, and physical harm and Plaintiff does not require the federal court to sit in review of any state court judgments.

30.     Upon information and belief, this court also has jurisdiction over these matters pursuant to wit, but not limited to, the U.S. code § 1030-Computer Fraud and Abuse Act (CFAA), 18 U.S. Code §2-Aiding and Abetting, 42 U.S Code § 1320d-6(a)(1)(C) et seq.- (HIPAA), 47 U.S. Code §233(a)(1)(d)-Stalking and Harassment, 42 U.S Code § 1395(dd)-Patients' Rights under Medicaid, U.S. Code § 2-Prinicpal Punishment for Principal Offense, 18 U.S.C. § 241Conspiracy against Rights,  18 U.S.C § 242 Deprivation of Rights, - District courts; and whatsoever rules, laws, regulations and Federal Rules of Civil Procedure may apply. The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

## **PRELIMINARY INTRODUCTION**

31.    This action is brought by Plaintiff against the Defendants pursuant to 42 U.S.C. §1983 and 42 U.S.C §1988 as applicable to the fourth, fifth, fourteenth amendments of the United States Constitution, for the claims to with, but not limited to of conspiracy, unlawful restraint/kidnapping, malicious actions, whistleblower retaliation, deprivation of property and

rights, and a claim for municipal liability as to the unlawful seizure of Plaintiff ZAKKIYYA CARTER

## **FACTUAL BACKGROUND TO CLAIM ONE**

32.      On the date in question, in the daylight hours, the plaintiff's adversary of over two years prior to the date of the incident, defendant ALICIA FLOOD, and the plaintiff's distant acquaintance at the time, defendant SHALONNA WATTS, illicitly acquired the plaintiff's phone number.

33.      The defendants persistently invaded the plaintiff's privacy by repeatedly calling her phone, despite her explicit requests to cease such communications. This ongoing conduct constituted harassment and demonstrated a blatant disregard for the plaintiff's rights and well-being.

34.      Defendants FLOOD and WATTS then unlawfully acquired the plaintiff's exact location at 599 Highgate Avenue in the City of Buffalo.

35.      Defendants proceeded to engage in a deliberate and ongoing course of conduct that constituted stalking and harassment of the Plaintiff. Defendants circled the direct location and area of plaintiff numerous times. This pattern of behavior was not only intrusive but instilled a significant concern for the Plaintiff's safety and well-being.

36.      At nightfall, the defendants trespassed on the premises of the plaintiff's location by exiting their vehicle without authorized consent, thereby instigating a verbal altercation at the scene.

37.    The plaintiff, the leaseholder of the residence, or any authorized party at this location did not invite, summon, or provide the direct address to the defendants FLOOD and WATTS for access to these specific premises.

38.    The plaintiff was then compelled to invoke her rights and asserted self-defense tactics. This action was necessitated by the unauthorized presence of the defendants FLOOD and WATTS.

39.    The engagement of self-defense was executed through a direct and assertive verbal confrontation, where the plaintiff questioned the defendant's actions regarding their unlawful actions in obtaining her phone number, location, and the underlying motives.

40.    Shortly thereafter, the father of the plaintiff's son arrived at the scene of the incident.

41.    It was later revealed that defendant FLOOD had engaged in improper conduct by directly contacting the father of the plaintiff's son through communications with his significant other Jane Doe, who works at the same employment agency as defendant FLOOD.

42.    The defendant, FLOOD, acted with reckless disregard by summoning the father of the plaintiff's son without possessing any legitimate authority to invite or summon another individual onto someone else's premises and/or property. This unauthorized action resulted in substantial and unforeseen harm to the plaintiff, further complicating an already volatile situation and exacerbating the confusion that ensued.

43.    Shortly thereafter, during the verbal confrontation and altercation amongst all parties, co-defendants JOHN DOE'S and subsequently defendants CRISIS SERVICES approached the scene of the incident.

44.    Upon the approach of JOHN DOE, defendant FLOOD unequivocally acknowledged her role in summoning JOHN DOE's to the scene of the incident, yet there exists no credible

evidence to substantiate that she made an emergency call for any form of assistance. This situation is profoundly concerning and strongly reinforces the plaintiff's allegations that this was a premeditated attack orchestrated against them based on whistleblower retaliation.

45.    This situation is of further concerning, as it involves the same police district and several of the same officers who have repeatedly targeted and harassed the plaintiff following a legal dispute with external parties that JOHN DOE'S is contracted with. The incident in question marks the fourth instance of such behavior occurring within a mere 26 days during August 2022, all involving constitutional violations against the plaintiff.

46.    Defendants FLOOD and WATTS also exhibited an alarming level of familiarity with co-defendants CRISIS SERVICES at the scene, despite not being the "Requesting Parties" who called Crisis Services on behalf of the plaintiff.  This matter further substantiates the plaintiff's allegations that this incident was orchestrated as a premeditated attack oppose to an isolated incident.

47.    Defendants FLOOD and WATTS begin to maliciously initiate unfounded accusations to JOHN DOES' and co-defendants CRISIS SERVICES, by making claims they heard and alleged the Plaintiff was engaging in erratic, dangerous, and bizarre behavior attributed to a serious mental illness (SMI) and made unfounded claims about the plaintiff's late mother having a serious mental illness (SMI).

48.    This action was done with the deliberate intent of having her unjustly hospitalized, despite the fact that they had no prior direct communication with her prior to their unauthorized calling during daylight hours.

49.    In this instance, the plaintiff has not had any direct communication or friendship with defendant FLOOD since February 20, 2020, nor any direct communication with defendant

WATTS since July 06, 2022, to raise any valid concerns attributable to the plaintiff's behavior and thought content within the recent period.

50.     During the relevant period, the defendants FLOOD and WATTS never made any claims to co-defendants JOHN DOE officers and/or CRISIS SERVICES that plaintiff was danger to them through substantial threats due to a serious mental illness.

51.     The defendants FLOOD and WATTS did not have the burden of proof that plaintiff was suffering a behavioral health (BH) crisis due to a substantiated serious mental illness (SMI) or possessed the lawful knowledge the plaintiff's late mother was diagnosed with a serious mental illness (SMI).

52.     Defendants FLOOD and WATTS did not have the burden of proof that plaintiff posed a danger to herself or others due to a serious mental illness (SMI).

53.      Upon information and belief, defendants FLOOD and WATTS, during the relevant period did not have the appropriate licensure required to conclude a mental health diagnosis in the plaintiff in accordance with New York State Education Law §§ 6500 et seq to third parties, notably; co-defendants CRISIS SERVICES.

54.     Defendants FLOOD and WATTS acted without any authorization nor were they relevant sources to make any recommendations or medical decisions on behalf of the plaintiff pursuant to subdivision (a) of § 9.40 New York State Mental Hygiene Law.

55.     Upon information and belief, it is asserted that upon the arrival of the defendants, CRISIS SERVICES, they were present at the scene when the trespassing parties arrived. It is alleged that they observed the purported behavioral health (BH) crisis at a distance for approximately one hour, during which time they did not intervene until JOHN DOE'S arrived.

56.     It is important to note that the plaintiff, the leaseholder of the residence, or any authorized party at this location did not invite, summon, or provide the direct address to the defendants CRISIS SERVICES and JOHN DOE'S for access to these specific premises.

57.     In accordance with the defendants CRISIS SERVICES general intake report to wit, but not limited too, it was noted that the plaintiff was at "Kiesha" house of 599 Highgate suffering from an alleged behavioral health (BH) crisis due to a serious mental illness (SMI) where "Kiesha" called defendants to the scene of incident as the "Requesting Party".

58.     In this instance, defendants CRISIS SERVICES who were allegedly called to the scene to provide intervention on behalf of the plaintiff by an entity who does not have any legal standing as a living person and nor established relationship with the plaintiff, notably, "Kiesha" failed to provide timely intervention of a purported behavioral health (BH) crisis.

59.      The plaintiff unequivocally asserts that they have no knowledge of any entity referred to as "Kiesha." Furthermore, the plaintiff is not related to this entity in any capacity. Additionally, it is imperative to clarify that the plaintiff was never homeless, residing at any location associated with "Kiesha."

60.      Upon information and belief, the defendants, CRISIS SERVICES, are held accountable for their inaction and delay in intervening during the escalation of the confrontation of a purported behavioral health (BH) crisis. Their prolonged wait to take any action directly contributed to the situation worsening for the plaintiff, thereby making them complicit in any resulting consequences due to their prolonged distant observation.

61.      Upon information and belief, the defendants, CRISIS SERVICES, deliberately extended the wait time for intervention as part of a premeditated strategy to collect observational

evidence. This tactic was aimed at constructing a narrative that falsely portrayed the plaintiff as a threat due to alleged serious mental illness (SMI).

62.    As it is evident the plaintiff was provoked through aggravated harassment, stalking, and fear for her concern and safety. A Second Circuit case dealing with the seizure of a woman for a psychiatric evaluation, the Court held that evidence that the woman appeared irrational, annoyed, and very uncooperative was not sufficient to imply that she appeared dangerous and to establish probable cause for arrest. *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016).

63.    During their approach to the scene, defendants CRISIS SERVICES failed to engage in any form of communication with the plaintiff. Instead, they exhibited a familiarity with co-defendants FLOOD and WATTS by directly approaching co-defendants at the scene for statements, then subsequently engaged in communications with co-defendants JOHN DOES.

64.    This occurred despite the presence of multiple parties, including the legitimate authorized parties of 599 Highgate, who were visibly present during their purported observation to take statements upon their approach to the scene, they strictly only conversed with their trespassing parties, notably co-defendants FLOOD, WATTS and JOHN DOE'S.

65.    Defendants CRISIS SERVICES neglected to conduct a proper assessment of the plaintiff or verify the allegations made against her, including an evaluation of the plaintiff's mental health status. Instead, they hastily concluded that the purported allegations were true without any substantiated historical inquiries or investigation into the facts surrounding the situation.

66.    The plaintiff unequivocally asserts that she did not enter into any contractual agreement with the defendants, CRISIS SERVICES, which would classify her as a client entitled to receive services. This assertion is based on the fact that any purported engagement was solely predicated

on a one-time preliminary telephonic triage attributed to an entity that lacks legitimacy and credibility, and or a valid relationship with the plaintiff, notably "Kiesha."

67.     Shortly thereafter, the plaintiff was approached by defendant JOHN DOE demanding the plaintiff has to undergo a mental health evaluation.

68.     The plaintiff unequivocally stated her refusal to undergo a mental health evaluation, asserting that she did not provide consent for such an assessment. Furthermore, she demanded clarification on the necessity of being subjected to a mental health evaluation.

69.     JOHN DOE stated to the plaintiff, the order was directed by co-defendants CRISIS SERVICES. The evaluation in question was pursuant to an §9.45 under Article 9 of the New York Mental Hygiene Law (MHL) for involuntary treatment or confinement.

70.     At this critical juncture, neither CRISIS SERVICES nor JOHN DOE provided the plaintiff with the necessary informed consent or due process as mandated by law. Furthermore, they failed to adequately disclose to the plaintiff the reasons necessitating a mental health evaluation and failed to show plaintiff a removal order at the scene.

71.     The plaintiff, having explicitly withheld consent, was subjected to intimidation tactics by JOHN DOE officers who threatened her with arrest if she didn't comply. This coercive environment compelled her to acquiesce to an unlawful restraint, that resulted in her being moved to Erie County Medical Center against her will.

72.     The defendants, CRISIS SERVICES and JONH DOE'S, acted without any probable cause or a valid removal order when they conspired to unlawfully restrain the plaintiff, in order to be moved to the hospital against her will. Their actions were not only unjustified but also violated the plaintiff's personal autonomy and rights.

73.    The Defendants, CRISIS SERVICES, unequivocally lacked the requisite jurisdiction over the Plaintiff to make any determinations regarding the Plaintiff's standing within the community without conducting a valid initial assessment and/or obtaining a removal order. Their actions were not only unauthorized but also an overreach of their purported authority, which infringed upon the rights of the Plaintiff.

74.    Defendants CRISIS SERVICES and JOHN DOE'S had more than sufficient time to investigate the matter and comply with established protocols prior to their deliberate actions before forcing having the plaintiff unlawfully restrained against their will.

75.    The plaintiff unequivocally exhibited no behaviors or indicators attributed to a dangerous behavioral health (BH) crisis that would have obstructed CRISIS SERVICES from executing a thorough and independent investigation or assessment regarding her situation, regardless of any claims of lacking jurisdiction in this matter. It is also important to note, JOHN DOE officers were well aware the defendants CRISIS SERVICES were not nearby the premises until they approached the scene.

76.    The actions of defendants FLOOD, WATTS, CRISIS SERVICES, JOHN DOE'S, and alleged external parties constitute complicity in a conspiracy to unlawfully restrain the plaintiff with the intent to prevent their liberation, in violation of New York Penal Law § 135.10, without any legal justification or probable cause.

**First Cause of Action for Violation of the Fourth Amendment as per 42 U.S.C. §1983 for the conspiracy to deprive Plaintiff of constitutional rights by Defendants City of Buffalo Police Officers JOHN DOES, CRISIS SERVICES, ALICIA FLOOD and SHALONNA WATTS.**

77.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action.

78.    To establish a claim for conspiracy under § 1983, Plaintiff must show that two or more persons agreed to violate her constitutional rights. See Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).

79.    Defendants conspired to unlawfully seize, restrain, and detain the Plaintiff without probable cause or legal justification, acting in concert to deprive her of her Fourth and Fourteenth Amendment rights.

80.    The actions of Defendants constitute a conspiracy to interfere with Plaintiff's civil rights in violation of § 1983. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970).

**Second cause of action for violation of the Fourteenth  Amendment as per 42 U.S.C. §1983 for Plaintiff's due process rights by Defendants City of Buffalo Police Officers JOHN DOES and CRISIS SERVICES.**

81.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action.

82.    The Fourteenth Amendment protects individuals from deprivation of life, liberty, or property without due process of law. See Mathews v. Eldridge, 424 U.S. 319 (1976).

83.    Defendants failed to provide Plaintiff with the required procedural protections before seizing her and moving her to ECMCC. This includes the failure to obtain informed consent, the failure to provide notice or a hearing, and the lack of any court order authorizing the detention.

84.     Defendants CRISIS SERVICES who failed to conduct an initial assessment on the plaintiff before making any determinations or verifying the allegations made against her violated her civil liberties.

85.     Defendants CRISIS SERVICES did not have clear and convincing evidence the plaintiff was a danger to herself or others due to a serious mental illness (SMI) pursuant to a § 9.45.

86.     Defendants CRISIS SERVICES never obtained informed consent from the plaintiff before infringing upon her fundamental liberty to make decisions about her own medical treatment and personal freedom.

87.     The plaintiff did not give defendants CRISIS SERVICES explicit consent to be involuntarily hospitalized for immediate care, observation and treatment that ultimately deprived her of this civil liberty.  Plaintiff's person should not have been seized pursuant to the CRISIS SERVICES own policies and procedures and pursuant to established New York State Mental Hygiene Law, as well as the Fourth Amendment of the U.S. Constitution.

88.     The plaintiff repeats and realleges each and every foregoing allegation of this complaint with full force and effect for defendants JOHN DOES set forth herein.

89.     Defendants JOHN DOES who were ultimately called to the scene by unauthorized parties based on false allegations and fraudulent pretenses failed to conduct an investigation prior to intimidating and/or coercing the plaintiff through threats of arrest to be moved against her will. Defendants fail to inform her about the reasons for confinement. They failed to afford plaintiff the opportunity to contest the allegations before it occurred and lacked a properly obtained removal order on her behalf and/or failed to present removal order to plaintiff.

90.    Defendants JOHN DOE'S acted without proper legal procedures being followed and/or provided proof of hospitalization resulting in violations under the Fourteenth Amendment's due process clause. Plaintiff's person should not have been seized pursuant to the Buffalo Police Department's own policies and procedures and pursuant to established state law, as well as the Fourth Amendment of the U.S. Constitution.

91.    The plaintiff seeks compensatory damages for actual harm suffered, punitive damages to deter future misconduct, and constitutional injury damages pursuant to 42 U.S.C. § 1983 for these violations.

**Third cause of action for violation of the Fourteenth  Amendment as per 42 U.S.C. §1983 for unlawful seizure and restraint of Plaintiff  by Defendants City of Buffalo Police Officers JOHN DOES and CRISIS SERVICES.**

92.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action.

93.    The Fourth Amendment guarantees protection against unreasonable searches and seizures. It is well-established that "[s]eizures conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).

94.    In this case, Defendants jointly conspired to unlawfully seize Plaintiff from her authorized premises to transport her to ECMC for involuntary confinement, without a warrant, court order, removal order or exigent circumstances.

95.    The seizure and subsequent detention of the Plaintiff were unreasonable and unlawful, as Defendants lacked probable cause to believe that Plaintiff posed a danger to herself or others.

See Myers v. Patterson, 819 F.3d 625 (2d Cir. 2016) (holding that irrational behavior alone is insufficient to justify involuntary commitment under the Fourth Amendment).

96.    Joined defendants JOHN DOE'S and CRISIS SERVICES were not summoned by an authorized party at the incident location and acted as trespassers by unlawfully seizing the plaintiff on the premises where she was located.

97.    The plaintiff seeks compensatory damages for actual harm suffered, punitive damages to deter future misconduct, and constitutional injury damages pursuant to 42 U.S.C. § 1983 for these violations.

### Fourth cause of action for violation of the Plaintiff's Fourth Amendment Rights to be protected against illegal searches of her person as per 42 U.S.C. §1983 per Monell v. Department of Social Services, 436 U.S 658 (1978) against Defendants City of Buffalo.

98.    Plaintiff repeats and reiterates each and every foregoing allegation of this Amended Complaint with full force and effect as if set forth at length in this cause of action.

99.    To establish a municipal liability claim, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Torraco v. Port Auth. of N.Y. & N.J., 615 F.3d 129, 140 (2d Cir. 2010) (quoting Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007)). A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to

the rights of the plaintiff and others encountering those subordinates [emphasis added].

Iacovangelo v. Corr. Med. Care, Inc., 624 F. App'x 10, 13-14 (2d Cir. 2015) (formal policy officially endorsed by the municipality); Matusick v. Erie Cty. Water Auth., 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); Carter v. Inc. Vill. of Ocean Beach, 759 F.3d 159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); Jones v. Town of E. Haven, 691 F.3d 72, 81 (2d Cir. 2012) (policymaking official's "express" or "tacit" ratification of low-level employee's actions).). Relating to widespread and pervasive practices and using logical inferences to impute knowledge onto policymakers, circumstantial evidence can be sufficient to support an inference that . . . a municipal policy or custom exists." Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993)).

100.    Defendants The City of Buffalo are liable for an illegal search conducted against the Plaintiff, and all resultant damages, under the Monell Doctrine.

101.    A municipality may be liable for constitutional violations under § 1983 when such violations arise from a failure to properly train or supervise employees. See City of Canton v. Harris, 489 U.S. 378, 388 (1989).

102.    The City of Buffalo failed to train and supervise their employees, including police officers and CIT trained staff, on the proper procedures for involuntary psychiatric commitment, directly leading to the violation of Plaintiff's rights.

## FACTUAL BACKGROUND FOR CLAIM TWO

103.     Upon the plaintiff's arrival at Erie County Medical Center/Corporation, she was unlawfully detained in the CPEP triage area for an excessive period of two hours before being subjected to a standard intake evaluation.

104.     The defendant's JANE DOE's who conducted the interview identified themselves as a Social Worker of the hospital and a Crisis Service representative.

105.     This intake evaluation was conducted based on the false allegations that were disclosed by defendants CRISIS SERVICES and under the guise that the plaintiff arrived on legal status of § 9.45 papers under the provisions of the New York State Mental Hygiene Law (MHL).

106.     The plaintiff unequivocally asserts she never underwent a § 9.45 evaluation and the intake evaluators failed to confirm one taking place.

107.     In this critical moment, the plaintiff diligently detailed the sequence of events to defendants, JANE DOE's in a quest for transparency and a clear understanding of why she was unjustly confined. Despite the plaintiff's unwavering honesty, accompanied by her story not mentioning a evaluation being conducted, these defendants callously neglected to disclose the rationale behind her confinement, hastily concluding the evaluation within mere minutes.

108.     The following day on August 30, 2022, the plaintiff was forcibly subjected to an unauthorized 9.27 evaluation by the defendants, MARK SUTTON and LAURA HANRAHAN in the daylight hours.

109.    Defendants SUTTON and HANRAHAN failed to obtain inform consent as required by law from the plaintiff, explicit consent and lacked clear and convincing evidence indicating the plaintiff was a threat to herself or others due to a substantiated mental illness that warranted this evasive evaluation.

110.    This action also contravened the 72hr observation period that is required for a patient to undergo this procedure before being subjected to any other evaluations. Furthermore, the plaintiff was denied access to her medication for a mold exposure diagnosis.

111.    The § 9.27 evaluations were further conducted under the guise that the plaintiff arrived on 9.45 papers (Legal Status) violating procedure compliance and the plaintiff's due process rights.

112.    Defendants SUTTON and HANRAHAN failed to verify if the plaintiff underwent a 9.45 evaluation. Subsequently, the defendants SUTTON and HANRAHAN admitted the plaintiff pursuant to § 9.27 of the New York State Mental Hygiene Law (MHL), despite the absence of an emergency assessment pursuant to § 9.45 of the New York State Mental Hygiene Law (MHL) being conducted.

113.    The admission requirements under an application as per § 9.27 of the NYS (MHL) did not strictly adhere to the prescribed protocols delineated in the relevant regulations. There was no clear and convincing evidence the plaintiff posed an imminent threat, that would enforce a § 9.27 evaluation against her will or any lawful objective evidence she suffered from an alleged Mental Illness.

114.    The admission was conducted without providing Written Notice of the plaintiff's status in accordance with § 9.07, nor was there a Notification of Admission provided  as stipulated by § 9.29 of the New York State Mental Hygiene Law (MHL).

115.     Furthermore, the required procedures outlined in the OMH 471A (Involuntary Admission on Medical Certification) application, as mandated by § 9.27 of the New York State Mental Hygiene Law, were not followed.

116.     This oversight constituted a violation of the plaintiff's rights, resulting in the forfeiture of her due process protections related to the adjudication for challenging involuntary commitment in accordance with a Writ of Habeas. It is important to note that a Certificate of Application, in accordance with either statute (§ 9.45 or § 9.27), was not filed with the courts to be adjudicated on.

117.     In the case at bar,  the plaintiff was faced with ongoing kidnapping as there was an actual intent to confine the plaintiff against her will without lawful justification or probable cause, making defendants SUTTON and HANRAHAN complicit in the conspiracy with defendants FLOOD, WATTS, CRISIS SERVICES, and JOHN DOE'S to deprive the plaintiff of her civil liberties without due process and without lawful justification.

118.     During these evasive interviews conducted by SUTTON and HANRAHAN, that were characterized by a lack of straightforwardness, the plaintiff was questioned about various matters, but not limited to, her relationship with the individual named "Kiesha", mentioned herein, if she disclosed that the FBI was pursuing her, and if she possesses any thoughts of self-harm. The plaintiff firmly denied having any suicidal thoughts and attributions about the FBI and stated that she did not recognize or have any knowledge of who "Kiesha" is. It is important to note, plaintiff also did not make any threats to harm others during the relevant period.

119.     During a subsequent evaluation with defendant LAURA HANRAHAN on or around August 31, 2022, after the plaintiff recounted the same events in chronological order. Defendant HANRAHAN stated to the plaintiff in a rude tone, "I don't believe a thing you're saying, and

feel like you're withholding information from me," before abruptly leaving the room, concluding their interview. It is important to note she lacked any verified proof or knowledge of the plaintiff's character being dishonest.

120.    During the relevant time period, the plaintiff uncovered a devious scheme orchestrated by unknown parties who incessantly contacted the hospital staff, falsely asserting authority over the plaintiff's medical care, masquerading as her son's father and former fiancé, advocating for her to remained confined.

121.    However, this deception was exposed when the actual son's father contradicted these claims to the medical staff directly. The defendants failed to take into consideration the newly discovered evidence.

122.    During this distressing ordeal, the plaintiff was subjected to another unauthorized evaluation by defendant NICOLE ABRUZZINO. At this critical juncture, the plaintiff was coerced into participating in an interrogation by defendant ABRUZZINO under the threat that any refusal would directly obstruct her timely release.

123.    During the plaintiff's interview with defendant ABRUZZINO, the plaintiff recounted the same events and provided her with a list of individuals whom she explicitly instructed not to communicate with on her behalf upon the conclusion of their interview. This list notably included the defendants ALICIA FLOOD and SHALONNA WATTS.

124.    The coerced interview conducted by defendant ABRUZZINO led to unforeseen harm to the plaintiff in a Family Court setting, mentioned hereinafter.

125.    On or about September 01, 2022, without lawful justification or reasonable cause, the plaintiff was taken into custody leading to her ongoing kidnapping and relocated to FiveZoneFour unit at ERIE COUNTY MEDICAL CENTER/CORPORATION under the

unauthorized care of defendant JULIA RINGLE. This action occurred despite the absence of informed consent as required by law.

126.     During the initial interviews with the defendant JULIA RINGLE, the plaintiff detailed the events in chronological order and questioned why she was not released following the conclusion of the interview. Defendant JULIA RINGLE adamantly insisted on further observation and evaluation of the plaintiff based on false information attributed to the fictious collateral source "Kiesha" and defendants CRISIS SERVICES false allegations.

127.     Defendant RINGLE did not have clear and convincing evidence in accordance with the Article 9 New York State Mental Health Laws that the plaintiff posed as a threat to herself or others due to a substantiated serious mental illness(SMI) to keep the plaintiff confined.

128.     This action made defendant JULIA RINGLE complicit in the conspiracy with defendants SUTTON, HANRAHAN, FLOOD, WATTS, CRISIS SERVICES, and JOHN DOE OFFICERS to deprive the plaintiff of her civil liberties without due process and without lawful justification.

129.      Shortly thereafter, it was brought to the plaintiff's attention by another patient that she had the right to request a discharge hearing. Subsequently, a discharge hearing was initiated and formally submitted on September 02, 2022, at the plaintiff's request.


130.     During the period preceding the Mental Health court discharge hearing on September 07, 2022, the plaintiff encountered an issue regarding the whereabouts of her iPhone 12 device. This predicament arose when she required access to her phone for the second time to retrieve essential contact information.

131.     Defendant MARKEITH PRIDGEON, who had been summoned by the plaintiff via a Jane Doe medical personnel due to his role in managing patients' belongings, reportedly

informed the plaintiff that he was experiencing difficulties in locating her phone and was actively engaged in its search.

132.     The plaintiff expresses bewilderment regarding the disappearance and untrace ability of her phone over an extended period. The plaintiff's confusion stems from the fact that the phone was securely placed inside her compact purse, which was the sole property she had on her person before being unlawfully restrained and moved to the hospital against her will.

133.     Days later, defendant PRIDGEON suddenly was able to locate the plaintiff's iPhone 12 and brought it up to the unit where she was located.

134.     It was later revealed upon a thorough investigation, the plaintiff's iPhone 12 device had been unlawfully tampered with and replaced. Following the plaintiff's discharge from Erie County Medical Center/Corporation and upon further examination, she was given a blue iPhone 12 back oppose to her black iPhone 12 she had brought into the hospital with her.

135.     The plaintiff's inability to immediately notice the replacement of her phone right away, was attributed to her phone case bearing a striking resemblance. Furthermore, the plaintiff was impeded from accessing her phone fully as a result of the hospital's stringent policy restrictions.

136.     Unknown suspects illicitly accessed and assumed complete control over all functionalities of this phone for a duration of nearly two weeks before it was disposed of. This breach resulted in the destruction of crucial evidence intended for utilization in a civil action, along with the compromise of her Gmail account, social media profiles, banking applications, location data, as well as the personal identification numbers (PINs) linked to her debit cards and phone, leaving the plaintiff vulnerable to intense stalking, harassment,  and elevated fear for her safety.

137.     The inaction of defendant PRIDGEON, who failed to protect and guard the plaintiff's belongings led to unforeseen harm, making him complicit in the conspiracy to obstruct the plaintiff's privacy and subject to her unlawful surveillance and fear for her concern and safety.

138.     On September 07, 2022, around the 9:00AM hour, while in anticipation of the plaintiff's Mental Health discharge hearing, the hospital custodians finally addressed the cleanliness of her room and the unit. This action was in direct response to the plaintiff's numerous complaints regarding the unsanitary conditions that had persisted since their transfer to the unit, citing the absence of sanitizing and daily cleaning in the living area as needed.

139.     Shortly after, the plaintiff was then escorted by hospital staff to the location of the court proceedings, adjacent to the FiveZoneFour unit.

140.      Prior to entering the proceedings area, Jane Doe informed the plaintiff that Judge Hon. Wojtaszek was assigned to preside over the case. The plaintiff, represented by her assigned counsel, was accompanied by her attorney and her son's father, who further advocated in support of the plaintiff's release.

141.     During a portion of the proceedings, the plaintiff's attorney cross-examined defendant JULIA RINGLE and challenged her justifications for keeping the plaintiff confined. One of the arguments raised by defendant RINGLE was the plaintiff's continued denial of having any connections with the entity named "Kiesha" who was listed as the relative and Collateral Source for the plaintiff during her hospitalization.

142.     However, the plaintiff's assigned counsel clarified that the sole connection the plaintiff had with a relative named "Kiesha" was one who had passed away almost ten years prior.

143.     Additionally, the plaintiff's son's father provided testimony in support of the plaintiff. He confirmed and alluded to the facts that the plaintiff did not pose an imminent threat to his

safety during the date of incident and that the plaintiff did not make any threats prior to him

being summoned by defendant FLOOD on the date of incident.

144.    Plaintiff's son's father further confirmed he felt there was no reason that the plaintiff

should be subjected to any further confinement.

145.    After the witness's testimony, all involved parties in the case actively engaged in the

legal proceedings and provided their arguments regarding the matter. Subsequent to no further

verbal arguments being presented before the plaintiff, the presiding judge rendered her decision.

146.    In  this juncture, the plaintiff harbored a strong belief that she heard the judge issue

an order for her release, resulting in the plaintiff being escorted back to the unit where she

commenced packing her belongings.

147.    Shortly thereafter, Joe, a medical professional entrusted with the responsibility of

monitoring the unit, approached the plaintiff's room. He informed her that a decision had not yet

been reached and that the court was currently in recess.

148.    Subsequently, he revisited her room and conveyed the unfortunate news that the judge

had denied the plaintiff's discharge in her absence.

149.    This action, purportedly undertaken by the presiding judge, resulted in ex parte

communications that contravened procedural compliance and infringed upon the plaintiff's due

process rights as guaranteed under the Fourteenth Amendment of the U.S. Constitution and New

York State law (CPLR § 3103). Consequently, this violation precluded the plaintiff from

asserting any defenses in their case.

150.    During this particular moment, the plaintiff inquired to Joe about any insights

regarding the reason for her denied release. Joe's response indicated his lack of involvement or

presence during the legal proceedings, as the information was conveyed by an unidentified staff member at the hospital.

151.    Subsequently, the plaintiff realized that her personal belongings had gone missing while she was at court, this included her paper trail that she intended to use as evidence. Upon discovering this, she promptly brought it to Joe's attention.

152.    A thorough search was conducted within the unit, encompassing searches in all patients' rooms, yet no trace of the missing items was found. Within the subsequent hour, it was alleged that hospital custodians had re-entered the plaintiff's room to clean for a second time within approximately 20 mins and mistakenly assumed her belongings were disposable.

153.    In the course of the plaintiff's case, her belongings were eventually returned to her possession. However, upon inspection, it was revealed that crucial documentation essential for her records and potential legal proceedings had inexplicably vanished.

154.    A nearby longstanding employee of the hospital, who had firsthand knowledge of the incident in question and other events related to the plaintiff, such as the disappearance of her phone for an extended period and her observable normal behavior when not under the influence of medication to wit, but not limited to, casually remarked aloud, "somebody's targeting that girl."

155.    On September 08, 2022, the defendant JULIA RINGLE conducted another evaluation on the plaintiff.

156.    During this interaction, defendant RINGLE coerced the plaintiff into taking psychotropic medication by offering a release in two weeks in exchange. This occurred despite the plaintiff consistently displaying normal behavior and without lawful adjudication. RINGLE failed to possess clear and convincing evidence that the plaintiff was a risk to herself or others.

157.    Furthermore, under Section 33.03 of the MHL, if a patient is found to lack capacity to consent due to their mental illness, medication may only be administered after obtaining court authorization. JULIA RINGLE lacked said authorization, violating procedural compliance.

158.    The following morning, on September 09, 2022, the plaintiff reported sensations akin to a potential heart attack and described feeling unusual and discomforting bodily sensations upon waking up after the intake of Risperidone medication the previous night.

159.    The potential side effects and concerns regarding more grave reactions to this psych medication over a two-week period in order to be discharged were significant. As a result, the plaintiff felt compelled to reach out to family members, their appointed attorney, and the Supreme Court building to seek clarification on the final ruling of the court hearing, since the medical personnel were taking unusually long in providing the plaintiff with a copy of the court order as requested.

160.    In this instance, as opposed to the plaintiff being provided with the court order from the hearing, she was handed a copy of a filed petition, requesting Medicine Over Objection bearing a submission date of September 8, 2022.

161.    It was then uncovered that the defendant, PAULA FEROLETO, was the actual judge presiding over the case. This information was provided by a chief clerk employee at the Erie County Supreme Court Building.

162.    Moments later, a senior psychiatrist named Dori Marshall forced the plaintiff off the phone in order to conduct a second opinion, before the plaintiff could obtain any further information regarding the court order and grounds for the ruling.

163.    After the plaintiff and Ms. Marshall's interview was concluded, she was then set for release the same day in the late afternoon, September 09, 2022.

164.        During the plaintiffs involuntarily admission ranging from August 29, 2022, through

September 9, 2022, all defendants, CRISIS SERVICES, SUTTON, HANRAHAN, and RINGLE

did not disclose the allegations made against the plaintiff as outlined in the Crisis Services report,

nor did they obtain informed consent from the plaintiff during any of the purported interactions.

165.        This omission constitutes a number of violations under the New York State Mental

Hygiene Law. The plaintiff  became aware of these allegations and other pertinent information

only after receiving their complete medical records post-discharge.

166.        Consequently, it appears that the defendants, SUTTON, HANRAHAN, and RINGLE

intentionally exploited the plaintiff's lack of awareness regarding these allegations with the

intent to inflict psychological harm and to label the plaintiff as incapacitated due to a mental

health condition, despite her Patient Safety Check Report reflecting normal behavior without the

aid of medication.

167.        The plaintiff further asserts, the actions of defendants SUTTON, HANRAHAN, and

RINGLE for falling significantly below the standard of care was done with the intent to carry out

the orchestrated premeditated scheme to retaliate and intimidate against the plaintiff in order to

undermine her credibility with the external parties she was involved in a legal dispute with.

These same external parties were also under contract with defendants JOHN DOE officers.

168.        The defendants failed to provide clear and convincing evidence justifying the

involuntary admission of the plaintiff. Hearsay allegations, attributed to a non-existent entity,

notably "Kiesha" who does not have any legal standing as a living person and CRISIS

SERVICES doesn't meet the legal requirements as evidence.

169.        The fabrication of false memories in a patient constitutes not only a violation of

legal statutes but also breaches the ethical standards established within the medical profession.

Specifically, under New York State law, such actions may contravene provisions outlined in the New York Consolidated Laws, Public Health Law § 2801 and the New York State Education Law § 6530, which govern professional conduct and mandate that practitioners uphold patient welfare.

170.    It is evident that the defendants utilized unlawful tactics to try to convince the plaintiff that these false memories were based on reality as an agenda to justify their egregious actions.

171.    Furthermore, manipulating or misrepresenting a patient's statements to serve a particular agenda, thereby infringing upon an individual's autonomy and rights, can be classified as criminal behavior under New York Penal law, §20.00.

172.    This situation exemplifies Political abuse of psychiatry also known as punitive psychiatry through the form of medical coercion/bullying, and psychiatric labeling that was aimed at silencing the plaintiff with a mental illness for her participation in exercising her First Amendment Rights. See https://hogg.utexas.edu/the-political-abuse-of-psychiatry-against-dissenting-voices and https://en.wikipedia.org/wiki/Political_abuse_of_psychiatry to distinguish the similarities from the plaintiff claims and articles set forth therein.

**First cause of action for violation of the Fourth Amendment as per 42 U.S.C. §1983 for the illegal seizure of Plaintiff person by Defendants SUTTON, HANRAHAN, RINGLE, and JANE DOE'S**

173.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action.

174.    The Fourth Amendment of the United States Constitution protects the citizenry for unreasonable seizures. "[S]eizures conducted outside the judicial process, without prior approval

by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a

few specifically established and well-delineated exceptions." Katz v United States, 389 US 347,

357 (1967).

175.    In the case at bar, defendants CRISIS SERVICES and JOHN DOE officer's

trespassed the premises of the plaintiff and conspired to unlawfully seize her from the premises

and transported her to ECMC for involuntary confinement without a warrant, court order,

removal order or exigent circumstances.

176.    The seizure and subsequent detention of the Plaintiff were unreasonable and

unlawful, as Defendants lacked probable cause to believe that Plaintiff posed a danger to herself

or others. See Myers v. Patterson, 819 F.3d 625 (2d Cir. 2016) (holding that irrational behavior

alone is insufficient to justify involuntary commitment under the Fourth Amendment)

177.    Defendants did not meet the typical requirements to specific legal standards,

including probable cause or sufficient justification to hold plaintiff against her will.

178.    The Supreme Court has established that individuals cannot be deprived of their

liberty without sufficient justification. For instance, in *Addington v. Texas*, 441 U.S. 418 (1979),

the Court held that civil commitment must be supported by clear and convincing evidence that

the individual poses a danger to themselves or others.

179.    Defendants did not have clear and convincing evidence that the plaintiff posed a

danger to themselves or others.

180.    Plaintiff's person should not have been seized pursuant to the New York State Mental

Health Hygiene laws, as well as the Fourth Amendment of the U.S. Constitution.

181.    As a result, Plaintiff was subjected to unlawful restraint and confinement in violation

of her Fourth Amendment rights. The plaintiff seeks compensatory damages for actual harm

suffered, punitive damages to deter future misconduct, and constitutional injury damages

pursuant to 42 U.S.C. § 1983 for these violations.

## **Second Cause of Action for Violation of the Fourth Amendment as per 42 U.S.C. §1983 for**

## **the conspiracy and deprivation against rights of Plaintiff by Defendants JANE DOES,**

## **SUTTON, HANRAHAN, RINGLE.**

182.     Plaintiff repeats and reiterates each and every foregoing allegation of this complaint

with full force and effect as if set forth at length in this cause of action.

183.     To maintain a claim for conspiracy a plaintiff must establish: (1) an agreement

between two or more persons; (2) intent to commit an unlawful act; (3) at least one overt act

taken in furtherance of that agreement; and (4) knowledge and participation by each conspirator;

See Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).

184.     Defendants conspired to unlawfully seize, restrain, and detain the Plaintiff without

probable cause or legal justification, acting in concert to deprive her of her Fourth and

Fourteenth Amendment rights. In situations where individuals conspire to transport a plaintiff to

a hospital against her will, such actions may be deemed unreasonable under the Fourth

Amendment. The Supreme Court has established that "[s]eizures conducted outside the judicial

process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth

Amendment – subject only to a few specifically established and well-delineated exceptions."

This principle underscores that any coordinated effort by several actors to forcibly remove an

individual from their environment, without judicial oversight or consent, constitutes a violation

of constitutional rights.

185.     In the case at bar, the Plaintiff was unlawfully restrained and moved to Erie County

Medical Center/Corporation through a maliciously premeditated orchestrated scheme, under

false pretenses carried out by defendants FLOOD, WATTS, CRISIS SERVICES and JOHN DOES. Defendants SUTTON, HANRAHAN, and RINGLE who jointly had the plaintiff admitted and kept seized over the course of 12 days with the intent to support the narrative that the plaintiff was suffering from a behavioral health (BH) crisis due to a serious mental illness (SMI) that posed a danger to herself or others where stabilization was needed.

186.    The plaintiff clearly expressed to defendants SUTTON, HANRAHAN, and RINGLE on multiple occasions that she has no acknowledgment of "Kiesha" who was listed as the collateral source and transparently disclosed to defendants of the true events that led to her unlawful restraint which did not identify or fit the criterion to be involuntarily committed.

187.    Defendants chose to only acknowledge and participate in the collusion with co-defendants despite the plaintiff having no objective evidence of having a history of any serious mental illnesses and denied plaintiff her prescribed medication.

188.    This matter is further concerning, particularly given that the defendants, CRISIS SERVICES and SUTTON, HANRAHAN, RINGLE, along with ERIE COUNTY MEDICAL CENTER/CORPORATION, failed to submit an insurance claim for the initial psychotherapy session with the patient and for the inpatient treatment related to her involuntary commitment.

189.    The sole insurance claim filed was on August 29, 2022, by Erie County Medical Center/Corporation for crisis services treatment rendered. This pattern suggests that the plaintiff independently sought treatment and was subsequently released, which had the ability to compromise her whereabouts being untraceable. Such circumstances imply another ulterior motive among all parties involved.

190.    It is evident that defendants further conspired to deprive the plaintiff of her constitutional rights through an involuntary commitment without legal justification or probable cause.

191.    The plaintiff seeks compensatory damages for actual harm suffered, punitive damages to deter future misconduct, and constitutional injury damages pursuant to 42 U.S.C. § 1983 for these violations.

**The Plaintiff asserts a third cause of action for violation of the Fourteenth Amendment under 42 U.S.C. §1983, specifically citing the due process clause against Defendants SUTTON, HANRAHAN, RINGLE, and JANE DOE.**

192.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action.

193.    The Fourteenth Amendment protects individuals from deprivation of life, liberty, or property without due process of law. See Mathews v. Eldridge, 424 U.S. 319 (1976). The defendants did not provide the plaintiff with clear reasons for her involuntary commitment to the hospital, violating her right to due process as guaranteed by the Fourteenth Amendment.

194.    Defendants failed to provide Plaintiff with the required procedural protections before seizing her and committing her to ECMC. This includes the failure to obtain informed consent, the failure to provide notice or a hearing, and the lack of any court order authorizing the detention. The defendants failed to obtain informed consent from the plaintiff prior to her involuntary commitment, which is essential in ensuring that individuals understand their rights and the implications of their treatment.

195.     The defendants neglected to issue written notices as required by law regarding the plaintiff's commitment status and her rights therein, further infringing upon her due process rights.

196.     The defendants did not adequately disclose or explain the plaintiff's rights during the commitment process, thereby depriving her of an opportunity to challenge her involuntary commitment effectively. As a result of these failures, the plaintiff was unable to properly adjudicate or contest her involuntary commitment, leading to a significant violation of her constitutional rights.

197.     The plaintiff seeks compensatory damages for actual harm suffered, punitive damages to deter future misconduct, and constitutional injury damages pursuant to 42 U.S.C. § 1983 for these violations.

**The Plaintiff asserts a fourth cause of action for violation of the Fourteenth Amendment under 42 U.S.C. §1983, citing unreasonable searches and siezures against Defendant MARKEITH PRIDGEON**

198.     Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action.

199.     Defendant MARKIETH PRIDGEON whose role with Erie County Medical Center/Corporation is responsible for managing patient's belongings.

200.     The Plaintiff's Fourth Amendment right against unreasonable seizures was violated when Defendant PRIDGEON allowed unauthorized access to her personal belongings without consent.

201.     Evidence shows that Defendant PRIDGEON either directly participated in or negligently failed to prevent outside parties from tampering with Plaintiff's phone.

202.    As a result of these actions, Plaintiff suffered damages including loss of her true mobile device and critical evidence along with tracking capabilities being placed on the replacement phone and compromised data that defendant PRIDGEON turned over to the plaintiff, that put her in personal safety at jeopardy.

203.    The plaintiff seeks compensatory damages for actual harm suffered, punitive damages to deter future misconduct, and constitutional injury damages pursuant to 42 U.S.C. § 1983 for these violations.

**The Plaintiff asserts a fifth cause of action for violation of the Fourteenth Amendment, as provided under 42 U.S.C. §1983, specifically citing the due process clause against Defendant PAULA FEROLETO.**

204.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action.

205.    The plaintiff has a constitutional right to due process under the Fourteenth Amendment, which guarantees that no person shall be deprived of life, liberty, or property without due process of law.

206.    The plaintiff requested a discharge hearing where her liberty was at stake. This hearing was a critical juncture where the plaintiff should have been afforded all procedural protection.

207.    The defendant, PAULA FEROLETO, conducted a recess during the hearing without ensuring that the plaintiff was present or properly informed about this decision, thereby violating her right to participate fully in her defense.

208.    After the alleged recess, when the plaintiff returned under the impression that she had been released, she was instead denied release without having had an opportunity to present further arguments or evidence in her favor.

209.    The actions taken by the defendant directly impacted the plaintiff's liberty interests by denying her release based on incomplete proceedings and without her presence during critical discussions.

210.    The defendant's failure to allow the plaintiff to be present during significant parts of the hearing constitutes a violation of established procedural safeguards required for due process.

211.    In cases like Harlow v. Fitzgerald" which established the "clearly established law" standard for qualified immunity, meaning a judge must have had clear knowledge that their actions violated the Constitution to be held liable;

212.    Under the New York Judiciary Law § 4, defendant FEROLETO had a "clearly established law" to ensure the plaintiff had the right to be heard in court to present their case fully and respond to opposing arguments.

213.    Defendant FEROLETO had a "clearly established law" duty to uphold the constitution and protect the liberty interest of the plaintiff rights that are guaranteed under the due process clause under the Fourteenth Amendment.

214.    The plaintiff did not waive her rights to fair treatment and lawful adjudication.

215.    Defendant FEROLETO actions deprived the plaintiff of meaningful participation that directly impacted her liberty interests.

216.    The plaintiff seeks redress for these violations through appropriate legal channels as permitted under 42 U.S.C. §1983 for damages resulting from deprivation of constitutional rights.

**Sixth cause of action for Failure to Train and Supervise as per 42 U.S.C. §1983 per against Defendants ERIE COUNTY MEDICAL CENTER and/or ERIE COUNTY MEDICAL CENTER CORPORATION.**

217.     Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action.

218.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

219.     A municipality may be liable for constitutional violations under § 1983 when such violations arise from a failure to properly train or supervise employees. See City of Canton v. Harris, 489 U.S. 378, 388 (1989).

220.     The ECMCC failed to train and supervise their employees, including medical staff, on the proper procedures for involuntary psychiatric commitment, patient's belongings and breaches in privacy set forth hereinafter that directly led to the violation of Plaintiff's rights.

### FACTUAL BACKGROUND TO CLAIM THREE

221.     On June 22, 2023, the plaintiff participated in further proceedings on an Article 10 Neglect petition, at Erie County Family Court, which unbeknownst to them, turned out to be a non-jury trial concerning their daughter.

222.     Prior to this event, on March 3rd, 2023, the plaintiff was contacted by Vernita Thompson, an Erie County CPS agent. During the interaction between Ms. Thompson and the plaintiff, it was communicated that the plaintiff's daughter was at risk of being removed from her father's home.

223.     This imminent removal stemmed from an alleged six-month investigation that had concluded her investigation against the indicated father of the plaintiff's daughter. Ms. Thompson further communicated to the plaintiff that her daughter only has two (2) options of

placement and that will be either through defendant ALICIA FLOOD or through the foster care system.

224.    The plaintiff was unaware of the six-month investigation due to Ms. Thompson failure to notify the plaintiff of a grave situation that involved her daughter.

225.    Despite the plaintiff expressing their concern for Ms. Thompson that defendant ALICIA FLOOD posed a conflict of interest and requested that she bring her daughter to the plaintiff's current residence instead. However, Ms. Thompson disregarded this request and employed unlawful, unconstitutional tactics that ultimately resulted in the plaintiff's daughter being placed under the care of defendant FLOOD.

226.    In the course of the hearing on June 22, 2023, the plaintiff, who was deemed pro se on the record that day, was not afforded the opportunity to adequately prepare for the proceedings. At this critical juncture, Vernita Thompson and their appointed counsel, Amy Inzina, summoned the defendant, NICOLE ABRUZZINO, to provide testimony against the plaintiff.

227.    Prior to defendant ABRUZZINO taking the stand, Amy Inzina engaged in discussions and presented defensive arguments insinuating that the plaintiff posed a safety risk to her daughter. These objections were made with the intent to prevent the plaintiff's daughter from being released into her custody.

228.    Inzina's arguments were based on the fraudulent diagnoses and behavioral assessments unlawfully disclosed by defendants CRISIS SERVICES without consent or privilege stemming from the August 29, 2022, incident set forth herein. Furthermore, the reports from CRISIS SERVICES also indicated that the plaintiff was diagnosed with bipolar disorder, which was then communicated to Erie County Child Protection on August 30, 2022.

229.    Upon defendant ABRUZZINO taking an oath to testify against the plaintiff, she proceeded to fabricate a fictitious and misleading account concerning the plaintiff's behavior, actions, and mental health status during their involuntary commitment at Erie County Medical Center on dates from August 29, 2022, through September 09, 2022.

230.    Defendant ABRUZZINO alluded to the narrative, that the plaintiff orchestrated a plan to get herself admitted into CPEP for SSI benefits. She further narrates an account that the plaintiff was exhibiting erratic and bizarre behavior during their purported interview at ECMCC.

231.    The actions of defendant ABRUZZINO in making false statements regarding the plaintiff's behavior and conduct, as well as fabricating a narrative that the plaintiff orchestrated a plan to secure her admission to CPEP for the purpose of obtaining SSI benefits, constitute complicity in a conspiracy with defendants CRISIS SERVICES, FLOOD, WATTS, JOHN DOE OFFICERS, SUTTON, HANRAHAN and RINGLE to support their narrative that plaintiff was a danger to the herself or the community.

232.    This conduct infringed upon the plaintiff's rights, specifically her right to intimate association with her daughter, as protected under New York State law. Pursuant to CPLR § 3016(b), allegations of fraud must be stated with particularity, which is relevant here given the nature of the claims against ABRUZZINO and the other defendants.

233.    Additionally, under New York Domestic Relations Law § 70(a), any actions that interfere with parental rights can be actionable if they result in deprivation of custody or visitation. The combination of false statements and conspiracy to undermine the plaintiff's relationship with her child raises significant legal concerns under these statutes.

234.    The plaintiff then had the opportunity to cross examine defendant ABRUZZINO about a list of names she had provided to her at the hospital, asking her to read back each name.

In this exchange, defendant ABRUZZINO correctly identified all names except for Defendant ALICIA FLOOD. She deliberately mispronounced FLOOD's name to an unrecognizable degree, thereby shielding FLOOD in this matter from any involvement. Please refer back to paragraphs #122, #123, #124, #188 and #189 set forth herein.

235.    In or around July 2023, the plaintiff became aware that an ex-parte Order to Show Cause hearing had occurred concerning the plaintiff's medical records from Erie County Medical Center on approximately May 25, 2023, regarding the night in question.

236.    The plaintiff, who was not given the opportunity to participate in the proceedings or voice any objections on the record to protect her privacy, experienced the disclosure of her records to third parties under the authority of defendant LAURA FLEMING, the privacy officer at Erie County Medical Center/Corporation.

237.    In return, defendant FLEMING failed to fulfill her obligation to provide the plaintiff with the opportunity to exercise her due process rights. Specifically, defendant FLEMING neglected to initiate contact with the plaintiff, thereby depriving the plaintiff of her right to object to the disclosure of these records to individuals known to be involved in criminal activities.

238.    This failure on the part of the defendant FLEMING resulted in a violation of the plaintiff's constitutional rights under the due process clause and made her complicit in the conspiracy with defendants ABRUZZINO and FLOOD, and external parties, notably Vernita Thompson and Amy Inzina.

239.    This conduct resulted in further infringement upon the plaintiff's rights, specifically her right to intimate association with her daughter. The unauthorized disclosure of information led to additional discriminatory implications against the plaintiff, suggesting that she posed a safety risk to her daughter. This narrative is particularly troubling given that the alleged safety

concerns did not similarly apply to the plaintiff's son, further corroborating the plaintiff's claims

of collusion and conspiracy by defendants FLOOD and co-defendants ulterior motives set forth

herein.

240.       Upon further examination, the Article 10 Neglect proceedings initiated by Vernita

Thompson lacked proper jurisdiction. Due to Ms. Thompson's non-compliance with statutory

requirements under the FCA §§ 1035, 1036 and Family Court Act §1023 she failed to secure

jurisdiction over the proceedings due to improper service in accordance with CPLR 308. ***See:***

***Nationstar Mortgage LLC v. Esdelle, 186 A.D.3d 1384 (2020).***  This matter rendered the whole

family court proceedings null and void due to lack of jurisdiction further implicating defendant

FLEMING in wrongdoing.

241.       The action of defendant FLEMING also constituted a blatant Fourth Amendment

violation that protects against unreasonable searches and seizures. There was not probable cause

or established jurisdiction that would necessitate the breach of this amendment.

242.       The plaintiff was not the respondent in this Erie County Child Protection investigation

and the CPS agents in question did not properly gain jurisdiction over her daughter in an Article

10 neglect proceedings. The plaintiff did not waive her rights in these proceedings.

243.       On or about July 27, 2023, the plaintiff was forced to observe these records,

unlawfully disclosed under the custody and control of Vernita Thompson, before being turned

over to the custody of the presiding judge causing immediate distress and anxiety in the plaintiff.

244.       On or around January of 2024, the plaintiff filed for an amendment and addendum to

her medical records pertaining to her involuntarily commitment at Erie County Medical

Center/Corporation. The request was made in the effort to ensure complete transparency and

rectify inaccuracies, omissions that were substantiated by evidence, after having the opportunity to obtain her full medical file in October of 2023.

245 .    In April of 2024, Erie County Medical Center/Corporation sent a final decision to the plaintiff and informed her that her request had been denied. The denial was attributed to the fact that none of the physicians or treating doctors were currently employed at the facility. Subsequently, it was revealed that all the doctors, with the exception of defendant JULIA RINGLE, were still employed at the facility. JULIA RINGLE had transitioned to a new position at BestSelf Behavioral Health Inc, following the plaintiff's independent admission for therapeutic treatment as a result of all the retaliation, conspiracy and intimidating tactics that plaintiff had to endure.

## First Cause of Action for Violation of the Fourth Amendment as per 42 U.S.C. §1983 for the conspiracy to deprive Plaintiff of constitutional rights by Defendants NICOLE ABRUZZINO, LAURA FLEMING, and CRISIS SERVICES.

246.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action.

247.    Defendant ABRUZZINO conspired with co-defendants CRISIS SERVICES to unlawfully interfere with the Plaintiff's First Amendment right to intimate association with her daughter. ABRUZZINO provided false testimony under oath in a family court setting to wit, but not limited to, misrepresenting the Plaintiff's behavior and conduct to create a narrative that portrayed her as a safety risk to her daughter, ultimately leading to discriminatory ongoing custodial interference.

248.    Defendant FLEMING conspired with external parties to unlawfully invade the Plaintiff's right to privacy by releasing her medical records to the courts, which subsequently led to discriminatory actions affecting her custody of her daughter. The court proceedings lacked proper jurisdiction, and the plaintiff was not a responding party in the case, thereby further violating the Plaintiff's rights.

249.    The actions of Defendants constitute a conspiracy to interfere with Plaintiff's civil rights in violation of § 1983. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970).

<u>CHEVRON DEFERENCE DOCTRINE</u>

Given the U.S Supreme Court's  recent shift in Chevron Deference Doctrine, this court must independently assess the legality of the defendant's actions, without undue deference to their interpretations. The court must ensure that the defendants' actions are consistent with both statutory and constitutional mandates, particularly where fundamental rights are at stake.

**WHEREFORE**, Plaintiff ZAKKIYYA CARTER demands judgment on the above counts against the Defendants, their units, their officers, employees, against and other persons acting in concert or participation with them as stated above, and award the following amounts:

a. Compensatory damages in favor of the Plaintiff in an amount to be determined by a jury;

b. Exemplary damages in favor of the Plaintiff;

c. Costs of this action; and such other relief as the court may deem appropriate.

**<u>Certification and Closing</u>** Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for

support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 10-15-2024

_____
Signature of Plaintiff

Zakkiyya Carter
_____
Printed Name of Plaintiff